Comic Book Certification Serv. LLC v. CBCS Operations, LLC, 2025 NCBC 32.

STATE OF NORTH CAROLINA

WAKE COUNTY

COMIC BOOK CERTIFICATION
SERVICE LLC and MICHAEL
BORNSTEIN,

                Plaintiffs,

v.

CBCS OPERATIONS, LLC; CBCS
HOLDINGS, LLC; BECKETT
COLLECTIBLES, LLC; BECKETT
AUTHENTICATION SERVICES,
LLC; BECKETT COLLECTIBLES
HOLDINGS, LLC; BKX HOLDINGS,
LLC; THE BECKETT
COLLECTIBLES TRUST;
SOUTHERN HOBBY
DISTRIBUTION, LLC; SOUTHERN
HOBBY HOLDINGS, LLC; ELI
GLOBAL, LLC; and GLOBAL
GROWTH HOLDINGS, LLC,

                Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV036339-910

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

**THIS MATTER** is before the Court on Defendants CBCS Operations, LLC; CBCS Holdings, LLC; Beckett Collectibles, LLC; Beckett Authentication Services, LLC; Beckett Collectibles Holdings, LLC; BKX Holdings, LLC; The Beckett Collectibles Trust; Southern Hobby Distribution, LLC; and Southern Hobby Holdings, LLC's (the "Moving Defendants") Motion to Dismiss ("Motion to Dismiss" or "Motion," ECF No. 25).

**THE COURT**, having considered the Motion to Dismiss, the briefs of the parties, the arguments of counsel, and all appropriate matters of record,

**CONCLUDES** that the Motion to Dismiss should be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP, by H. Hunter Bruton, Justin Bernard Lockett, David Andrew Pasley, Noel Hudson, and Christopher Michael Anderson, for Plaintiffs.*

*Condon Tobin Sladek Thornton PLLC, by Aaron Z. Tobin, for Defendants CBCS Operations, LLC; CBCS Holdings LLC; Beckett Collectibles, LLC; Beckett Authentication Services, LLC; Beckett Collectibles Holdings, LLC; BKX Holdings, LLC; The Beckett Collectibles Trust; Southern Hobby Distribution, LLC; and Southern Hobby Holdings, LLC.*

Davis, Judge.

## INTRODUCTION

1. In this lawsuit, the plaintiff sought to grow his comic book grading business by entering into a business relationship with a company possessing experience in this industry. However, the ensuing fallout has proven to be anything but comical for the plaintiff, as he contends that he is owed millions of dollars and that his share of the business has been intentionally devalued. The plaintiff seeks relief both from that company as well as from a tangled web of other related entities. The present motion requires the Court to determine, among other things, which of those other entities are proper defendants in this action.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached to, referred to, or incorporated by reference in the complaint) that are relevant to the

Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at \*11 (N.C. Super. Ct. July 12, 2017).

3. Plaintiff Michael Bornstein is a pediatrician and resident of the state of Texas. (Am. Compl. ¶¶ 12, 53, ECF No. 19.)

4. In 2014, Bornstein—a comic book enthusiast—established a company called Comic Book Certification Service LLC ("Plaintiff CBCS," and together with Bornstein, "Plaintiffs") to provide comic book grading and encapsulation services to comic book collectors. (Am. Compl. ¶¶ 80–82.)

5. Plaintiff CBCS is a Delaware limited liability company and maintains an office in St. Petersburg, Florida. (Am. Compl. ¶ 81.) Bornstein is Plaintiff CBCS's majority shareholder and sole controller. (Am. Compl. ¶ 53.)

6. Initially, Plaintiff CBCS employed a small staff. (Am. Compl. ¶¶ 82–83.) By 2016, the company had grown to 26 employees and had taken over roughly 20% of the market for comic book grading services. (Am. Compl. ¶ 86.)

7. For several years, Bornstein remained heavily involved in Plaintiff CBCS's Florida-based operations while simultaneously maintaining a full-time pediatrics practice in Texas. Eventually, Bornstein looked to form a partnership with another established company in order to expand his business while allowing him more time to dedicate to his patients. (Am. Compl. ¶¶ 87–89.)

8. In August 2016, Bornstein contacted a representative of Defendant Beckett Collectibles, LLC ("Beckett Media & Collectibles")—a company that was allegedly "well-established in the collectibles space"—to discuss the possibility of

forming a business relationship with that company or one of its related companies. (Am. Compl. ¶¶ 90–92.)

9. It is helpful (although undoubtedly somewhat painful to the reader) for the Court to at least briefly identify the various entities named as Defendants in this case and to mention the ways in which they are interrelated.

10. Beckett Media & Collectibles is a North Carolina limited liability company and has a principal place of business in Texas. (Am. Compl. ¶ 57.) It is affiliated with several other entities, including Beckett Authentication Services, LLC (its parent company); Beckett Collectibles Holdings, LLC (its sole member); Collectivus, LLC f/k/a/ BKX Holdings, LLC (the sole member of Beckett Collectibles Holdings, LLC); and the Beckett Collectibles Trust (the sole member of Collectivus, LLC) (collectively, "Beckett Defendants"). (Am. Compl. ¶¶ 57–60.)

11. Beckett Collectibles Holdings, LLC is also the sole member of another company called Southern Hobby Distribution, LLC, which appears to be affiliated with Southern Hobby Holdings, LLC (together with Southern Hobby Distribution, LLC, the "Southern Hobby Defendants," and together with the Beckett Defendants, the "Non-CBCS Operations Defendants"). (Am. Compl. ¶¶ 64, 68.)

12. The Non-CBCS Operations Defendants, in turn, are all directly or indirectly owned and operated by another company called Global Growth Holdings, LLC ("Global Growth"). (Am. Compl. ¶ 74.) Global Growth is a Delaware limited liability company with a principal place of business in North Carolina. (Am.

Compl. ¶ 73.) At some earlier point, Global Growth was known as Eli Global, LLC ("Eli Global").[1] (Am. Compl. ¶ 73.)[2]

13. Global Growth and the Beckett Collectibles Trust are owned by a businessman named Greg Lindberg, who is a resident of the state of Florida. (Am. Compl. ¶¶ 62, 73.)[3]

14. During Bornstein's 2016 conversations about a possible business partnership between Plaintiff CBCS and one of the Beckett Defendants, he primarily interacted with Sandeep Dua, the President of Beckett Media, and Ben Allweil, a Vice President of Eli Global. (Am. Compl. ¶ 93.)

15. On 2 February 2017, Bornstein—on behalf of Plaintiff CBCS—signed a Term Sheet with a representative of Eli Global. (Am. Compl. ¶ 95.) "The Term Sheet contemplated [a future] sale of all the assets of [Plaintiff] CBCS to a new entity . . . which would be affiliated with the Beckett Defendants and Eli Global."[4] (Am. Compl. ¶ 96.) The new buyer entity referenced in the Term Sheet is Defendant CBCS Operations, LLC ("CBCS Operations"). (Am. Compl. ¶ 96.)

---

[1] The Amended Complaint asserts that the predecessor company of Global Growth was Eli Global. (Am. Compl. ¶ 73.) However, at the 21 May 2025 hearing on the present Motion, counsel for both sides admitted they were unsure whether it is Global Growth or Eli Global that is currently the viable company between the two.

[2] The present Motion is not brought on behalf of Defendants Global Growth or Eli Global, who are both currently unrepresented in this lawsuit.

[3] Although Lindberg is mentioned repeatedly in the Amended Complaint and is alleged to possess an ownership interest (either directly or indirectly) in all of the entities named as Defendants, he has not been named as a defendant in this lawsuit.

[4] The Term Sheet valued Plaintiff CBCS at $4 million. (Am. Compl. ¶ 98.)

16. On 19 October 2017, the parties officially closed on the asset sale contemplated by the Term Sheet ("Asset Sale"). (Am. Compl. ¶ 105.)

17. As part of the Asset Sale, several agreements were signed—three of which are directly relevant to this lawsuit.

18. First, Plaintiff CBCS (the seller), CBCS Operations (the buyer), and Bornstein (as Plaintiff CBCS's sole shareholder) signed an Asset Purchase Agreement ("APA," ECF No. 19.3).[5] Under the APA, CBCS Operations "purchased substantially all the tangible and intangible assets of" Plaintiff CBCS. (Am. Compl. ¶ 110.) In exchange, Plaintiff CBCS was to receive the following: (i) a cash payment of $1,109,976; (ii) annual "earn-out" payments[6]; (iii) "equity equivalence rights" pursuant to a second, separately signed agreement; and (iv) periodic payments for

---

[5] Lindberg signed the APA on behalf of CBCS Operations and Eli Global, and Bornstein signed both individually and as the Manager of Plaintiff CBCS. (Am. Compl. ¶ 109.) Eli Global was identified as a "beneficiary of the transaction" and agreed therein to indemnify Plaintiff CBCS from certain enumerated liabilities. (Am. Compl. ¶ 108.)

[6] According to the Amended Complaint,

[t]he Earn-Out Payments were calculated as follows:

> a. If the gross revenue of New CBCS during the applicable Earn-Out Period was 115% or more of the gross revenue during the previous Earn-Out Period, the Earn-Out Payment would be 4.5% of New CBCS's gross revenue during the applicable Earn-Out Period.

> b. If the gross revenue of New CBCS during the applicable Earn-Out Period was less than 115% of the gross revenue during the previous Earn-Out Period, the Earn-Out Payment would be 3.5% of New CBCS's gross revenue during the applicable Earn-Out Period.

(Am. Compl. ¶ 116.)

consulting services pursuant to a third, separately signed agreement. (Am. Compl. ¶ 111.)

19. Second, Plaintiff CBCS and CBCS Operations signed an Equity Equivalence Agreement, ("EEA," ECF No. 19.4), which memorialized the terms of Plaintiff CBCS's "equity equivalence rights" as set out in the APA.[7] Specifically, Section 1 of the EEA granted Plaintiff CBCS a 25% phantom equity interest in CBCS Operations, which could later be repurchased by CBCS Operations under certain conditions described in Section 2. (EEA §§ 1–2.) One of those stated conditions involves a "Sale" of CBCS Operations. (EEA § 2.) On this subject, Section 2 of the EEA states, in relevant part, as follows:

> 2. <u>Repurchase of the [Phantom Equity] Interest</u>. The [phantom equity] Interest will be repurchased by [CBCS Operations] in the event of a Sale (as defined below) of [CBCS Operations] or, if a Sale has not occurred, on one or more Determination Dates (as defined below) pursuant to the put/call rights set forth herein.

(EEA § 2.)

20. The EEA defines a "Sale" of CBCS Operations as

> the first to occur of the consummation of either: (x) a merger, share sale or exchange (or sale or exchange of other equity ownership interests), consolidation, or reorganization of the Company where the beneficial owners of the Company, immediately prior to such transaction, will not beneficially own, immediately after such transaction, shares or other equity ownership interests entitling such stockholders or LLC members to either: (A) more than a majority of all votes to which all stockholders (or members) of the surviving company would be entitled in the election of corporate directors or LLC managers, or (B) more than a majority of the aggregate fair market value of the then outstanding equity securities of the surviving company; or (y) a sale or other disposition of all or substantially all of the assets of the Company. For purposes of

---

[7] Lindberg signed the EEA on behalf of CBCS Operations, and Bornstein signed the document in his capacity as Manager of Plaintiff CBCS. (Am. Compl. ¶ 118.)

clarification, no Sale shall be deemed to have occurred if the transaction at issue is: (aa) consummated with any affiliate entity; or (bb) comprised of the Company's sale of newly issued equity securities for the purpose of raising capital for its operations.

(EEA § 2(b)(v)(5).)

21. Section 2(a) of the EEA provides that in the event of a sale (or change of ownership) of CBCS Operations—as defined in the EEA—Plaintiff CBCS is entitled to a "Transfer of Control Payment" equal to the value of the phantom equity interest multiplied by the purchase price of the sale. (EEA § 2(a).)

22. The repurchase of Plaintiff CBCS's phantom equity interest can also be triggered by either Plaintiff CBCS's exercise of a "put right" in or after the seventh year following execution of the EEA or by CBCS Operations's exercise of a "call right" in or after the tenth year following execution of the EEA. (EEA §§ 2(b)(i)–(ii).) If either the "put right" or "call right" are exercised, the EEA requires CBCS Operations to—among other things—prepare and deliver to Plaintiff CBCS a "Fair Market Value Statement" that includes CBCS Operations's EBITDA, along with the company's financial statements. (EEA § 2(b)(iii).)

23. The third agreement signed as part of the Asset Sale was a "Consulting Agreement," (ECF No. 19.5) (together with the APA and the EEA, the "Contracts"), memorializing CBCS Operations's annual obligation to pay Plaintiff CBCS $125,000 in exchange for certain consulting services, along with two "Relocation Payments"

worth $50,000 in the event CBCS Operations successfully relocates from its Florida office to Dallas, Texas by the deadlines set forth therein. (Consulting Agrmt. § 4(a).)[8]

24.     Notably, Section 3 of the Consulting Agreement states that the term of the agreement will end upon

> the earlier to occur of: (a) the termination of the employment contract of Steve Borock with the Company prior to the end of the stated term of such contract (except in the event of a termination by the Company, and excluding, for the avoidance of doubt, such individual's transition from full time to part time employment or the expiration of such individual's employment agreement at the end of its stated term); and (b) the ten (10)-year anniversary of the Effective Date (the "Initial Term").

(Consulting Agrmt. § 3.)

25.     Borock served as President and "Primary Grader" at Plaintiff CBCS. (Am. Compl. ¶ 83.) He was later hired by CBCS Operations around the time of the signing of the Consulting Agreement. (Am. Compl. ¶ 132.)

26.     The first payment due to Plaintiff CBCS under the Contracts was a lump sum payment of $1,109,796 pursuant to the APA. This payment was received on-time on 20 October 2017. (Am. Compl.¶ 143.)

27.     Beginning in or around 2018, however, the relationship between Bornstein and CBCS Operations began to deteriorate.

28.     Virtually all of the payments due to be made to Plaintiff CBCS under the Contracts between 31 July 2018 and 19 October 2022 were late—sometimes by over a month. (Am. Compl. ¶¶ 150, 152(c), 155(c), 156, 157(c), 159(d), 160(d), 162(b), 163(b), 171, 181.)

---

[8] Once again, Lindberg signed this contract on behalf of CBCS Operations, and Bornstein signed the document in his capacity as Manager of Plaintiff CBCS. (Am. Compl. ¶ 128.)

29.     Throughout this period, Bornstein exchanged several communications with personnel at CBCS Operations in an attempt to resolve the delays. However, these efforts proved futile, and the delays persisted and progressively worsened. Meanwhile, Bornstein received increasingly dismissive or hostile responses to his inquiries. (*See, e.g.*, Am. Compl. ¶¶ 147–48, 150–84.)

30.     For example, on 8 March 2018, Dua (then the President of Beckett Media & Collectibles) responded to a concern Bornstein had raised about a pending contractual deadline by simply stating that "[w]e will do what is good for the business." (Am. Compl. ¶ 148.)

31.     On another occasion, Dua told Bornstein that "he did not care about following a contract, but instead would take whatever action was best for his company and then have lawyers deal with the fallout." (Am. Compl. ¶ 154.)

32.     By late 2022, CBCS Operations had stopped making any payments to Plaintiff CBCS under the Contracts. (*See* Am. Compl. ¶ 199.) As a result, Plaintiff CBCS has—to date—never received the 2022 Consulting Payment, the 2023 Consulting Payment, the 2024 Consulting Payment, the 2023 Earn-Out Payment, or the 2024 Earn-Out Payment. (Am. Compl. ¶¶ 199–203.)

33.     Around the same time that the payments ended, and unbeknownst to Bornstein, "major personnel changes" were underway at CBCS Operations and at the Beckett Defendants. (Am. Compl. ¶ 168.) Bornstein first learned of these changes on 18 November 2022 through an email from Evgeny Gonokhin, who was apparently the new Controller of one of the Beckett Defendants. (Am. Compl. ¶ 169.) Gonokhin's

email to Bornstein read as follows: "CBCS became part of Beckett in September . . . thank you for your understanding as 100% of our team turned over in November." (Am. Compl. ¶ 169.) Bornstein responded by emailing the following message to Gonokhin: "I appreciate the turnover in ownership but [the 2022 Consulting payment is] coming up on two months overdue. Please, I would appreciate a response." (Am. Compl. ¶ 172.)

34. Over the next several months, Bornstein engaged in a flurry of email communications with Gonokhin and other individuals, including the General Counsel of one of the Beckett Defendants, Julie Robinson, regarding the past-due payments. (Am. Compl. ¶¶ 173–80.) Over the course of these email communications, the relationship between the parties continued to break down even further.

35. On 19 March 2023, Bornstein filed an arbitration demand against CBCS Operations pursuant to the terms of the Consulting Agreement. (Am. Compl. ¶ 186.)

36. During the ensuing arbitration ("2023 Arbitration"), CBCS Operations asserted—for the first time—that Steve Borock had voluntarily departed the company on 18 April 2022, thus terminating CBCS Operations's obligation to make payments under the Consulting Agreement. (Am. Compl. ¶ 187.) Bornstein "was surprised by this allegation," having previously been under the impression that Borock had been terminated and then re-hired by CBCS Operations in 2020, which Bornstein believed would not have impacted payments under the Consulting Agreement. (Am. Compl. ¶ 188.)

37.     Additionally, documents provided to Plaintiffs during the 2023 Arbitration revealed a series of internal emails between personnel at CBCS Operations and other Non-CBCS Operations Defendants that purported to demonstrate an increasing hostility toward Bornstein.  In one such email (sent on 21 December 2022), Jeromy Murray, who at that time was the President of Beckett Media & Collectibles, asked Pam Kesten, the Customer Service Manager at CBCS Operations, about the "special comic grading pricing" Bornstein was receiving as a condition of the Asset Sale.  (Am. Compl. ¶ 182, 191.)  Murray then asked: "Is there any way we can get out of this deal with [Bornstein]?"  (Am. Compl. ¶ 191.)  Similarly, on 7 February 2023, Murray wrote in a separate email to other personnel at the Beckett Defendants: "We need to figure out how to get out of this deal as well."  (Am. Compl. ¶ 192.)

38.     The parties did not resolve their disagreements during the 2023 Arbitration.  (Am. Compl. ¶ 193.)  On 21 October 2024, Plaintiff CBCS sent a letter to CBCS Operations demanding payment of the outstanding Consulting Payments and Earn-Out Payments.  (Am. Compl. ¶ 205; "Demand Letter," ECF No. 19.6.)  However, CBCS Operations did not respond.

39.     That same day, Plaintiff CBCS exercised its put right under the EEA by sending a put notice to CBCS Operations.  (Am. Compl. ¶ 207.)  The put notice set a 30 December 2024 deadline for CBCS Operations to provide Plaintiff CBCS with a Fair Market Value Statement and accompanying financial documentation.  (Am. Compl. ¶ 208–09.)

40. On 12 November 2024, Plaintiffs initiated this lawsuit by filing a Complaint in Wake County Superior Court. (ECF No. 3.) This matter was subsequently designated to the Business Court and assigned to the undersigned on 15 November 2024. (ECF Nos. 1-2)

41. After the filing of the initial Complaint in this matter (but before Plaintiff CBCS received the Fair Market Value Statement from CBCS Operations), several of the entities affiliated with CBCS Operations underwent a series of organizational changes. (Am. Compl. ¶¶ 211–13.)

42. First, on 19 November 2024, BKX Holdings, LLC, filed an amended Annual Report with the North Carolina Secretary of State reflecting a change in the address of its principal office from Orlando, Florida to an address in Texas—an address that was associated with CBCS Operations. (Am. Compl. ¶ 211.) Three days later, on 22 November 2024, that entity officially changed its name to Collectivus, LLC. (Am. Compl. ¶ 212.)

43. Next, on 17 December 2024, Collectivus was "established as the umbrella company over" Beckett Media & Collectibles, Southern Hobby Distribution, and another company called Dragon Shield. (Am. Compl. ¶ 213.)

44. Plaintiffs contend in this lawsuit that these changes constituted a sale (or change of ownership) of CBCS Operations and thus entitled them to receive notice of the transactions and additional payment from CBCS Operations under the terms of the EEA. (Am. Compl. ¶ 214, 220–21.) However, "[n]one of Defendants informed Dr. Bornstein of this transaction." (Am. Compl. ¶ 214.)

45. In or around December 2024, the Beckett Defendants "began transferring and assigning intellectual property rights of [CBCS Operations] to third-party entities . . . ." (Am. Compl. ¶ 215.)

46. On 20 December 2024, CBCS Operations provided Plaintiff CBCS with a Fair Market Value Statement, (ECF No. 19.2), "which demonstrated that the gross revenue and the value of [CBCS Operations] had dropped precipitously since 2022, when [CBCS Operations] last made an Earn-Out Payment." (Am. Compl. ¶ 216.) Notably, the Fair Market Value Statement included a $1,257,688.72 line item for "Unallocated exp of Beckett." (Fair Mkt. Value Statement, at 6.) In other words, CBCS Operations owed one or more of the Beckett Defendants over $1.25 million in unexplained expenses.[9] (Am. Compl. ¶¶ 46–47.)

47. Most surprisingly, the Fair Market Value Statement revealed that CBCS Operations had a *negative* EBITDA, which meant that Plaintiffs' phantom equity interest—originally estimated to be worth over one million dollars—had been rendered completely worthless. (Am. Compl. ¶¶ 48, 217, 223–24.)

48. This came as an unpleasant surprise to Plaintiffs, who "continued to believe in good faith . . . that [CBCS Operations] had continued to expand and grow, as contemplated at the time the [APA, EEA, and] . . . Consulting Agreement were executed[,] and that [their] contractual rights were also growing in value." (Am. Compl. ¶ 225.) By comparison, while the value of CBCS Operations declined, the value of its competitors grew. (Am. Compl. ¶¶ 292–95.)

---

[9] Plaintiffs contend that this evidences the financial entanglement between CBCS Operations and the Beckett Defendants. (Am. Compl. ¶ 218.)

49.    On 13 January 2025, upon receiving the Fair Market Value Statement, Plaintiffs revoked their put notice.  (Am. Compl. ¶ 222.)

50.    Plaintiffs filed an Amended Complaint—which is currently their operative pleading—on 3 February 2025.  The Amended Complaint lists the following entities as Defendants: CBCS Operations; CBCS Holdings, LLC; Beckett Media & Collectibles; Beckett Authentication Services, LLC; Beckett Collectibles Holdings, LLC; Collectivus; the Beckett Collectibles Trust; Southern Hobby Distribution, LLC; Southern Hobby Holdings, LLC; Eli Global; and Global Growth.  The Amended Complaint asserts claims against all Defendants for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, declaratory judgment, unfair and deceptive trade practices (UDTP), constructive fraud, and breach of fiduciary duty along with claims for an accounting and constructive trust.  (Am. Compl. ¶¶ 314–64, 383–93.)  In addition, Plaintiffs seek to pierce the corporate veil as to each of the Non-CBCS Operations Defendants and hold each of those entities jointly and severally liable.  (Am. Compl. ¶¶ 371–82.)

51.    On 20 March 2025, the present Motion to Dismiss was filed on behalf of all named Defendants with the exception of Global Growth and Eli Global.[10]  In the Motion, the Moving Defendants seek dismissal of all claims asserted against them, except for Plaintiffs' claim for breach of the APA against CBCS Operations.

52.    The Court held a hearing on the Motion to Dismiss via Webex on 21 May 2025 at which counsel for all represented parties were present.

---

[10] As of the present date, no counsel has entered an appearance on behalf of Global Growth or Eli Global.

53. The Motion to Dismiss has been fully briefed and is now ripe for resolution.

## LEGAL STANDARD

54. In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the complaint[,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (cleaned up).

55. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up)).

## ANALYSIS

56. For purposes of the present Motion, Plaintiffs' claims can be divided into two categories. The first category consists of their claims against CBCS Operations, which are largely based on the contractual relationship that existed between them. The second category consists of Plaintiffs' attempt to pierce the corporate veil as to

the Non-CBCS Operations Defendants, which consist of companies that were allegedly related in some way to CBCS Operations but with whom Plaintiffs did not have direct contractual dealings. The Court will address each of these categories of claims in turn.

## I.     Claims Against CBCS Operations

### A. Breach of Contract

57.     Plaintiffs allege that CBCS Operations breached the APA and Consulting Agreement "by failing to make contractually required payments when due." (Am. Compl. ¶ 318.) Plaintiffs also assert that CBCS Operations breached the EEA "by failing to respect Plaintiffs' contractual rights following" the alleged "Sale" of the company, and "by taking deliberate action to devalue Plaintiffs' phantom equity under the [EEA]." (Am. Compl. ¶¶ 322–23.)

58.     With regard to Plaintiffs' breach of contract claims, CBCS Operations only seeks dismissal of Plaintiffs' claims against it for breach of the EEA and Consulting Agreement. Therefore, the Court need not—and does not—address Plaintiffs' claim for breach of the APA.

#### 1. Standing

59.     As a threshold matter, Defendants argue that Bornstein lacks standing to assert a claim under the EEA and Consulting Agreement because he did not sign either of those documents in his personal capacity and instead did so solely in his capacity as a manager of Plaintiff CBCS.[11]

---

[11] However, the Moving Defendants do not challenge the standing of Plaintiff CBCS to assert these claims.

60.     In response, Plaintiffs contend that Bornstein does, in fact, possess standing to assert these claims because his signature appears on both of these documents and because the control he exercises over Plaintiff CBCS (by virtue of his role as its Manager) moots the standing issue, rendering it a mere "distraction."

61.     "A party has standing to initiate a lawsuit if he is a real party in interest. A real party in interest is one who benefits from or is harmed by the outcome of the case and by substantive law has the legal right to enforce the claim in question." *Beachcomber Props., LLC v. Station One, Inc.*, 169 N.C. App. 820, 823–24 (2005). On the other hand, "[a] party that lacks standing to bring a claim [faces] an insurmountable bar to recovery, and a motion under Rule 12(b)(6) is the proper legal mechanism to seek dismissal of a complaint on such grounds." *Am. Oil Co., Inc. v. AAN Real Est., LLC*, 232 N.C. App. 524, 525–26 (2014).

62.     Our Court of Appeals has held that "an agent is not 'individually bound when contracting within the scope of his employment.'" *Ascendum Mach., Inc. v. Kalebich*, 2021 N.C. App. LEXIS 245, at \*\*4 (2021) (unpublished) (quoting *Howell v. Smith*, 261 N.C. 256, 260 (1964)) (cleaned up). In situations "'where individual responsibility is demanded, the nearly universal practice in the commercial world is that the corporate officer signs twice, once as an officer and again as an individual.'" *Id.* (quoting *Keels v. Turner*, 45 N.C. App. 213, 218 (1980)). By contrast, "a party who only signs [an agreement] once in a representative capacity is not" personally bound by that agreement. *Id.* at \*\*5 (citing *RD & J Props. v. Lauralea-Dilton Enters.*, 165 N.C. App. 737, 742 (2004)).

63.     In reviewing both the EEA and Consulting Agreement, the Court notes that Bornstein signed both of these Contracts only once—doing so solely in his capacity as Manager of Plaintiff CBCS. By contrast, Bornstein signed the APA twice—once in his capacity as Manager of Plaintiff CBCS and a second time in his personal capacity.

64.     For this reason, the Court agrees that Bornstein lacks standing to assert an individual claim for breach of the EEA or of the Consulting Agreement. Therefore, his individual claims for breach of contract as to these two agreements are **DISMISSED**.

## 2. Breach of the Consulting Agreement

65.     With regard to the Consulting Agreement, Plaintiff CBCS alleges that CBCS Operations breached that contract by failing to make the various payments required thereunder in a timely fashion (or at all).

66.     CBCS Operations, conversely, argues that its obligations to make payments under the Consulting Agreement ceased upon the termination of the employment contract of Steve Borock.

67.     As noted above, Section 3 of the Consulting Agreement provides, in pertinent part, as follows:

> [T]he term of this Agreement shall begin as of the Effective Date and continue until the earlier to occur of: (a) the termination of the employment contract of Steve Borock with the Company prior to the end of the stated term of such contract (except in the event of a termination by the Company, and excluding, for the avoidance of doubt, . . . the expiration of such individual's employment agreement at the end of its stated term); and (b) the ten (10)-year anniversary of the Effective Date (the "Initial Term").

(Consulting Agrmt. § 3.)

68.     CBCS Operations contends that because Borock's employment agreement with CBCS Operations ended, the term of the Consulting Agreement also ended based upon the above-quoted language in Section 3.

69.     The Court rejects this argument because the Amended Complaint alleges that CBCS Operations *terminated* Borock's employment with the company in 2020 and then proceeded to rehire him under a different employment agreement. (Am. Compl. ¶ 188.)  Therefore, taking Plaintiffs' allegations as true—as the Court must do under Rule 12(b)(6)—the cancellation of his employment agreement is deemed to be "a termination by the Company[,]" which by the clear language of Section 3 is insufficient to terminate the obligations of CBCS Operations under the Consulting Agreement.

70.     The Court finds that Plaintiff CBCS's allegations are sufficient to raise factual questions as to the effect of Borock's severance from CBCS Operations on its obligations under the Consulting Agreement.

71.     For this reason, CBCS Operations's Motion to Dismiss is **DENIED** with regard to Plaintiff CBCS's claim against it for breach of the Consulting Agreement.

### 3.  Breach of the EEA

72.     Plaintiffs allege that CBCS Operations breached the EEA in two distinct ways: (1) by failing to honor Plaintiff CBCS's contractual rights regarding the Sale of CBCS Operations; and (2) by taking "deliberate action to devalue Plaintiffs' phantom equity" interest thereunder.  (Am. Compl. ¶¶ 322–23.)

73.     With regard to CBCS Operations's first theory of breach, the EEA defines a "Sale" as

> the first to occur of the consummation of either: (x) a merger, share sale or exchange (or sale or exchange of other equity ownership interests), consolidation, or reorganization of the Company where the beneficial owners of the Company, immediately prior to such transaction, will not beneficially own, immediately after such transaction, shares or other equity ownership interests entitling such stockholders or LLC members to either: (A) more than a majority of all votes to which all stockholders (or members) of the surviving company would be entitled in the election of corporate directors or LLC managers, or (B) more than a majority of the aggregate fair market value of the then outstanding equity securities of the surviving company; or (y) a sale or other disposition of all or substantially all of the assets of the Company. *For purposes of clarification, no Sale shall be deemed to have occurred if the transaction at issue is: (aa) consummated with any affiliate entity*; or (bb) comprised of the Company's sale of newly issued equity securities for the purpose of raising capital for its operations.

(EEA § 2(b)(v)(5) (emphasis added).)

74.     The allegations in Plaintiffs' Amended Complaint most relevant to this issue state as follows:

> 213. On December 17, 2024, Collectivus was established as the umbrella company over "Beckett Media & Collectibles, Dragon Shield, and Southern Hobby Distribution."

> 214. None of Defendants informed Dr. Bornstein of this transaction. *See* Exhibit C (noting that Plaintiffs have rights, including notice and payment, if [CBCS Operations] is sold or undergoes a change of ownership).

> . . .

> 300. Upon information and belief, in December of 2024, and prior to sending the Fair Market Value Statement, the Beckett Defendants began transferring and assigning intellectual property rights of [CBCS Operations] to third parties.

301. On December 17, 2024, just three days before [CBCS Operations] shared the Fair Market Value Statement with Dr. Bornstein, it was reported that Collectivus had become the parent company and "umbrella company over industry leaders Beckett Media & Collectibles, Dragon Shield, and Southern Hobby Distribution."

(Am. Compl. ¶¶ 213–14, 300–01.)

75. CBCS Operations disputes Plaintiffs' characterization of these events as a "Sale" or "change of ownership." Instead, they contend, these transactions were merely a "consolidation" involving affiliated entities and that "no assets changed hands." (Defs.' Br. Supp. Mot. Dismiss Pls.' Am. Compl. ¶ 64, ECF No. 26.)

76. Viewing the allegations "in the light most favorable to" Plaintiff CBCS, *Christenbury Eye Ctr., P.A.*, 370 N.C. at 5, the Court finds that the Amended Complaint sufficiently raises the specter of a "Sale" having occurred within the meaning of the EEA. Further factual development will be necessary to determine the specific details of the alleged transaction and the degrees of relation between the entities involved in that transaction. For present purposes, however, the Court finds that Plaintiffs' allegations on this subject are sufficient under Rule 12(b)(6).

77. Plaintiffs' second theory of breach of the EEA is premised on Defendants' allegedly intentional devaluation of Plaintiff CBCS's phantom equity interest in CBCS Operations.[12] However, the Amended Complaint does not allege the existence of an express provision of the EEA that would be violated by such conduct. Therefore, Plaintiffs' breach of contract claim on this second theory fails. *See, e.g., Glob.*

---

[12] As previously discussed, the value of Plaintiff CBCS's phantom equity interest is directly tied to the fair market value of CBCS Operations.

*Promotions Grp., Inc. v. Danas Inc.*, 2012 NCBC LEXIS 40, at **17 (N.C. Super. Ct. June 22, 2012) ("Plaintiffs fail to reference any contract in particular, let alone a specific contractual provision, that was breached. As such, Plaintiffs' Claim Twelve fails to state a Claim for breach of contract.").

78. For these reasons, CBCS Operations's Motion to Dismiss is **GRANTED** with respect to Plaintiffs' claim for breach of the EEA by intentional devaluation of Plaintiff CBCS's phantom equity interest.[13] Conversely, CBCS Operations's Motion to Dismiss is **DENIED** with respect to Plaintiffs' claims against it for breach of the Consulting Agreement and for breach of the EEA by failing to comply with its notice and payment obligations to Plaintiff CBCS regarding the "Sale."

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

79. CBCS Operations asserts two grounds for dismissal of Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. First, it argues that this claim fails for the same reasons that Plaintiffs' express breach of contract claims fail. Second, it contends that a standalone claim for breach of the implied covenant of good faith and fair dealing can exist only where a special relationship exists between the parties.

80. "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Weyerhaeuser Co. v. Godwin Bldg.*

---

[13] However, as discussed below, the Court finds that Plaintiffs' allegations regarding the intentional devaluation of Plaintiff CBCS's phantom equity interest are sufficient to support a claim for breach of the implied covenant of good faith and fair dealing.

*Supply Co.*, 40 N.C. App. 743, 746 (1979). To that end, "in every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 385 (2016) (cleaned up).

81. "Where a breach of contract claim survives dismissal, we have previously declined to dismiss a claim for breach of the implied covenant of good faith and fair dealing." *Innovare, Ltd. v. Sciteck Diagnostics*, 2023 NCBC LEXIS 8, at \*\*30 (N.C. Super. Ct. Jan. 19, 2023).

82. Therefore, Plaintiffs' express breach of contract theories discussed above, which the Court has held are sufficient to survive Rule 12(b)(6), are likewise sufficient to support a valid claim for breach of the implied covenant of good faith and fair dealing.

83. With regard to Plaintiffs' claim that Defendants intentionally devalued Plaintiff CBCS's phantom equity interest in violation of the EEA, the Court has—as discussed above—held that Plaintiffs have failed to show a specific provision of the EEA that was breached by such acts. The Moving Defendants assert that, in such circumstances, a separate claim for breach of the implied covenant can only exist where a special relationship exists between the parties—which is not the case here.

84. However, this Court has previously rejected a similar argument, holding that "[o]ur courts have not limited the claim in that fashion." *TAC Invs., LLC v. Rodgers*, 2020 NCBC LEXIS 143, at \*\*15–16 (N.C. Super. Ct. Dec. 7, 2020); *see also*

*Robinson v. Deutsche Bank Nat'l Tr. Co.*, No. 5:12-CV-590-F, 2013 U.S. Dist. LEXIS 50797, at *39–40 n.11 (E.D.N.C. Apr. 9, 2013).

85.    The essence of a claim for breach of the implied covenant of good faith and fair dealing is an allegation that one contracting party has acted to prevent the opposing party from receiving the benefits due under a contract. *See McDonald v. Bank of N.Y. Mellon Tr. Co.*, 259 N.C. App. 582, 586–87 (2018) ("To state a valid claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must plead that the party charged took action which injured the right of the other to receive the benefits of the agreement, thus depriving the other of the fruits of the bargain." (cleaned up)).

86.    This is precisely the sort of conduct that Plaintiffs have alleged here. As previously discussed, the Amended Complaint describes a series of deliberate efforts by Defendants designed to siphon and redirect funds through a laundry list of shell companies. These efforts, in turn, enabled the complete devaluation of Plaintiffs' phantom equity interest in CBCS Operations from an estimated $1 million to zero. Assuming these allegations are true—which the Court must do at this stage—the Court is unwilling to say that these acts could not constitute a breach of the implied covenant.

87.    Accordingly, the Court **DENIES** the Motion to Dismiss as to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

## C. Unjust Enrichment

88. We have previously stated the following regarding claims for unjust enrichment:

> "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 4, at *16 (N.C. Super. Ct. Jan. 12, 2017) (citing *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95-96, 150 S.E.2d 70, 73 (1966). However, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

*Higgins v. Synergy Coverage Sols., LLC,* 2020 NCBC LEXIS 6, at **23 (N.C. Super. Ct. Jan. 15, 2020).

89. CBCS Operations asserts that dismissal of Plaintiff CBCS's claim for unjust enrichment is warranted where—as here—express contracts exist between the parties.

90. However, "[i]n actions alleging breach of contract, plaintiffs may also plead unjust enrichment in the alternative." *Jessey Sports, LLC v. Intercollegiate Men's Lacrosse Coaches Ass'n*, 289 N.C. App. 166, 172 (2023) (cleaned up).

91. Although the better practice would have been for the Amended Complaint to expressly state that this claim was being pled solely in the alternative, under North Carolina's liberal notice pleading standard, the Court will assume that this is what Plaintiffs intended and will treat it as such.

92.    Accordingly, CBCS Operations's Motion to Dismiss is **DENIED** with respect to Plaintiffs' claim for unjust enrichment.

### D. Breach of Fiduciary Duty

93.    To state a claim for breach of fiduciary duty, a plaintiff must show that (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached its fiduciary duty; and (3) the defendant's breach of the fiduciary duty was a proximate cause of an injury sustained by the plaintiff. *Alkemal Sing. Priv. Ltd. v. Dew Glob. Fin., LLC*, 2018 NCBC LEXIS 36, at **33–34 (N.C. Super. Ct. Apr. 19, 2018).

94.    For a defendant to owe a plaintiff a fiduciary duty, "there must first be a fiduciary relationship between the parties." *Id.* at **34 (cleaned up). "A fiduciary relationship will arise not only from all legal relations, such as attorney and client, broker and principal, and principal and agent, but it extends to any possible case in which there is a confidence reposed on one side and a resulting domination and influence on the other." *Id.* (cleaned up).

95.    In support of their breach of fiduciary duty claim, Plaintiffs allege that

> as a result of the business relationship between Plaintiffs and [CBCS Operations], including, but not limited to the negotiation and execution of the [APA], the [EEA], and the Consulting Agreement, and the performance of these agreements, [CBCS Operations] was in a position of trust and confidence vis-a-vis Plaintiffs (who believed that Defendants would act in good faith to grow the value of [CBCS Operations], and as a result owed them a fiduciary duty and a duty of loyalty.

(Am. Compl. ¶ 355.)

96.    CBCS Operations, conversely, argues that no fiduciary relationship exists between itself and Plaintiffs such that dismissal of this claim is appropriate.

97. Our courts have held that "parties who interact at arms-length do not have a fiduciary relationship with each other." *Id.* at **36 (cleaned up). As such, "parties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract." *Id.* (cleaned up).

98. On this issue, the Court agrees with CBCS Operations and declines to transform what was an arms-length contractual relationship into a fiduciary one. *See Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C. App. 663, 666 (1990) ("Our review of reported North Carolina cases has failed to reveal any case where mutually interdependent businesses, situated as the parties were here, were found to be in a fiduciary relationship with one another. We decline to extend the concept of a fiduciary relation to the facts of this case."); *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 621 (2012) ("North Carolina courts generally find that parties who interact at arms-length do not have a fiduciary relationship with each other, even if they are mutually interdependent businesses.").

99. Therefore, CBCS Operations's Motion to Dismiss is **GRANTED** with respect to Plaintiffs' claim for breach of fiduciary duty.

**E. Constructive Fraud**

100. "Constructive fraud and breach of fiduciary duty are distinct claims with overlapping elements." *Panzino v. Map Mgmt. of Charlotte LLC*, 2021 NCBC LEXIS 13, at *4 (N.C. Super. Ct. Feb. 12, 2021). As previously discussed, a claim for breach of fiduciary duty requires a plaintiff to show "the existence of a fiduciary duty,

a breach of that duty, and injury proximately caused by the breach." *Id.* Meanwhile, "[c]onstructive fraud requires, as an additional element, that the defendant sought to benefit himself through the breach." *Id.*

101. Accordingly, for the same reasons set forth above in connection with Plaintiffs' claim for breach of fiduciary duty, CBCS Operations's Motion to Dismiss is **GRANTED** with respect to Plaintiffs' claim for constructive fraud. *See Highland Paving Co., LLC v. First Bank*, 227 N.C. App. 36, 42 (2013) ("Because plaintiff has failed to allege a relationship between it and First Bank that could constitute a fiduciary relationship, it cannot maintain its constructive fraud claim.").

**F. UDTP**

102. To establish a prima facie case for UDTP, a plaintiff must show: "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *General Fid. Ins. Co. v. WFT, Inc.*, 269 N.C. App. 181, 191 (2020) (cleaned up).

103. As an initial matter, CBCS Operations argues that Plaintiffs' UDTP claim must be dismissed because such a claim is reserved for "business activities" (which are not present here) and because N.C.G.S. § 75-1.1 aims to "benefit consumers" (a status that does not encompass either of the two Plaintiffs).

104. Neither argument possesses merit. N.C.G.S. § 75-1.1(b) specifically defines "commerce" as including "all business activities, however denominated . . . ." N.C.G.S. § 75-1.1(b). Furthermore, "[o]ur Supreme Court has also determined that

'commerce' can be broadly read to include intercourse for the purposes of trade in any form." *General Fid. Ins. Co.*, 269 N.C. App. at 191 (cleaned up).[14]

105.   Our courts have likewise made clear that a UDTP claim is not solely available to consumers.  *See White v. Thompson*, 364 N.C. 47, 52 (2010) ("[T]he [UDTP] Act was designed to achieve fairness in dealings between individual market participants.  To accomplish this goal, the General Assembly explained that the Act would regulate two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers.  The General Assembly sought for the Act to control any unfair or deceptive conduct occurring in one of these two types of interactions."); *Shannon v. Rouse Builders, Inc.*, 295 N.C. App. 144, 149–50 (2024) (noting that "in or affecting commerce" includes "all business activities" which, in turn, encompasses both "interactions between businesses and consumers" *and* "interactions between businesses" (cleaned up)).

106.   Therefore, the contractual relationship between Plaintiffs and CBCS Operations clearly constituted business activity that is encompassed by N.C.G.S. § 75-1.1.

107.   Nevertheless, North Carolina courts have emphasized that "actions for UDTP are distinct from actions for breach of contract, and a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action

---

[14] Although N.C.G.S. § 75-1.1(b) contains an enumerated exception to the definition of "commerce" for "professional services rendered by a member of a learned profession," that exception has no relevance here.  N.C.G.S. § 75-1.1(b).

under N.C.G.S. § 75-1.1." *Pathos Ethos, Inc. v. Braintap Inc.*, 2024 NCBC LEXIS 154, at **23 (N.C. Super. Ct. Dec. 9, 2024) (cleaned up).

108. Instead, "when a claimant alleges a UDTP violation based upon a breach of contract, the claimant must show substantial aggravating circumstances attending the breach." *Id.* at **23–24 (cleaned up). "As a general proposition, unfairness or deception either in the formation of the contract or in the circumstances of its breach may establish the existence of substantial aggravating circumstances." *Id.* at **24 (cleaned up). "However, it is not enough to allege the aggravating or egregious *results* of a breach. If that were the case, then any contract dispute that results in serious losses could present a valid UDTPA claim, a result North Carolina courts have repeatedly rejected." *Id.* (cleaned up).

109. Here, Plaintiffs have alleged more than a simple breach of contract. Instead, the Amended Complaint describes an elaborate scheme designed to help CBCS Operations avoid making required payments to Plaintiffs while secretly devaluing Plaintiffs' phantom equity interest. According to Plaintiffs' allegations, this scheme was made possible through corporate restructuring, the siphoning of funds and assets (including intellectual property) from CBCS Operations, and the deliberate funneling of those funds and assets through a convoluted web of entities. (Am. Compl. ¶ 228.)

110. For these reasons, the Court finds that Plaintiffs have adequately pled substantial aggravating circumstances so as to support a claim for UDTP such that CBCS Operations's Motion to Dismiss is **DENIED** with respect to this claim. *See,*

*e.g., General Fid. Ins. Co.*, 269 N.C. App. at 191–92 (affirming trial court's entry of judgment in favor of a plaintiff's UDTP claim where facts showed "Plaintiff obtained a significant award and judgment against [Defendant], [Defendant's president] transferred all of [Defendant's] assets to other companies, which either quickly failed or never conducted any business; the asset transfer prevented Plaintiff from enforcing its judgment against [Defendant] and all of this, in turn, had a harmful effect on commerce").

**G. Declaratory Judgment**

111. In the Amended Complaint, Plaintiffs request that the Court issue a declaratory judgment on the following three issues:

> a. The Asset Purchase Agreement, the Equity Equivalence Agreement, and the Consulting Agreement are valid and binding on Defendants according to their terms.
>
> b. Defendants must adhere to the terms of the Asset Purchase Agreement, the Equity Equivalence Agreement, and the Consulting Agreement, including by timely making all required payments and by respecting the valuation and cash-out rights held by Plaintiffs.
>
> c. Defendants must adhere to the terms of the Temporary Restraining Order, and any related Court orders, from the *Southland Nat'l Ins. Corp. v. Lindberg*, No. 19-CVS0013093 (N.C. Sup. Ct. filed Oct. 1, 2019) matter preventing Defendants from, among other things, taking "actions, or causing an affiliated company to take actions, inconsistent with maximizing the long-term equity value of the SACs."

(Am. Compl. ¶ 345.)

112. CBCS Operations asserts that the first two issues are duplicative of Plaintiffs' breach of contract claims and that the third issue encompasses matters beyond those at issue in the present case.

113. Section 1-257 of North Carolina's Uniform Declaratory Judgment Act provides that a court "may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding[.]" N.C.G.S. § 1-257. Additionally, "[m]any courts have previously recognized that a declaratory judgment does not serve a useful purpose where that purpose is only to resolve an already-existing breach of contract claim." *Port City Logistics, Inc. v. Chasewater Logistics, LLC*, No. 3:23-CV-541-RJC-DCK, 2024 U.S. Dist. LEXIS 146366, at *14 (W.D.N.C. July 17, 2024).

114. Plaintiffs' first two requested declarations clearly overlap with the subject matter of their breach of contract claims. Nonetheless, the Court, in its discretion, declines to dismiss them at the present time. *See, e.g.*, *Clark v. Burnette*, 2020 NCBC LEXIS 10, *17–18 (N.C. Super. Ct. Jan. 28, 2020) ("A motion to dismiss under Rule 12(b)(6) is seldom an appropriate pleading in actions for declaratory judgments, and will not be allowed simply because the plaintiff may not be able to prevail. It is allowed only when the record clearly shows that there is no basis for declaratory relief as when the complaint does not allege an actual, genuine existing controversy." (cleaned up)).

115. The Court reaches a different conclusion, however, with regard to the third issue as to which Plaintiffs seek a declaratory judgment.

116. Plaintiffs' third requested declaration concerns Defendants' compliance with a temporary restraining order ("TRO") entered in a separate lawsuit currently

pending in Wake County Superior Court, *Southland Nat'l Ins. Corp. v. Lindberg*, Wake Cnty. Sup. Ct. File No. No. 19-CVS0013093. *Southland* involves an alleged investment scheme implicating certain insurance companies owned by Lindberg. (Am. Compl. ¶ 249.) As part of the scheme, "Mr. Lindberg and his colleagues [allegedly] caused the insurance companies to place substantial portions of their policyholder funds into risky and improper investments [tied] to other non-insurance companies owned by Mr. Lindberg." (Am. Compl. ¶ 249.)

117. On 22 April 2024, the *Southland* Court appointed a receiver over Global Growth. That receivership still remains in effect. (Am. Compl. ¶ 256.) That Court also entered a TRO prohibiting Lindberg, Global Growth, or any of the other entities involved in the case from devaluing or encumbering certain affiliated entities, which include some of the Defendants involved in the present lawsuit. (Am. Compl. ¶ 258.)

118. On 28 August 2024, the presiding judge in *Southland* held Lindberg and Global Growth in civil contempt for repeated violations of the TRO and receivership. (Am. Compl. ¶ 265–66.)

119. Plaintiffs now seek a declaration from this Court requiring Defendants to adhere to the terms of the TRO (and other related orders) issued in *Southland*. However, they have failed to offer a persuasive argument as to how this Court possesses the authority to issue a ruling addressing the enforceability of orders issued by another judge in a separate legal proceeding.

120. Accordingly, the Motion to Dismiss is **GRANTED in part** and **DENIED in part** with regard to Plaintiffs' declaratory judgment claim.

### H. Accounting/Constructive Trust

121. Plaintiffs contend that they are entitled to receive copies of CBCS Operations's unaudited financial statements, along with a "complete accounting under North Carolina law." (Am. Compl. ¶¶ 384–85.) They further request that the Court impose a constructive trust upon all of CBCS Operations's assets, including "all monies distributed from [CBCS Operations] to any [other] Defendant or any third party to the extent such monies were the result of revenues that would have belonged to [CBCS Operations] but for the wrongful acts of Defendants as described in [the Amended Complaint]." (Am. Compl. ¶ 393.)

122. Accountings and constructive trusts "are remedies, not independent causes of action." *Mayer v. Goldner*, 2025 NCBC LEXIS 28, at **10 (N.C. Super. Ct. Mar. 17, 2025); *Glob. Textile All., Inc. v. TDI Worldwide, LLC*, 2018 NCBC LEXIS 104, at **25 (N.C. Super. Ct. Oct. 9, 2018).

123. Therefore, to the extent Plaintiffs' requests for an accounting and a constructive trust are pled as actual claims for relief, they are **DISMISSED without prejudice** to Plaintiffs' right to seek them as remedies in this action to the extent permitted by applicable law.

## II. Claims Against Non-CBCS Operations Defendants

124. In addition to asserting the claims discussed above against CBCS Operations, Plaintiffs also seek to pierce the corporate veil of each of the Non-CBCS Operations Defendants—all of whom (except for Eli Global and Global Growth) join

in the present Motion to Dismiss—so that each of them can be held jointly and severally liable for any sums that Plaintiffs recover in this litigation.[15]

125. Therefore, the analysis below applies to the following Defendants: CBCS Holdings, LLC; Beckett Media & Collectibles; Beckett Authentication Services, LLC; Beckett Collectibles Holdings, LLC; Collectivus, LLC f/k/a BKX Holdings, LLC; The Beckett Collectibles Trust; Southern Hobby Distribution, LLC; and Southern Hobby Holdings, LLC.

126. "[I]n the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438 (2008). At the same time, "exceptions to the general rule of corporate insularity may be made when applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim."[16] *Id.* at 439 (cleaned up).

127. Under certain circumstances, "courts will disregard the corporate form or 'pierce the corporate veil' when 'necessary to prevent fraud or to achieve equity'." *Id.* "Veil piercing is not a theory of liability but a form of relief that provides an avenue to pursue legal claims against those otherwise shielded by the corporate

[15] Although the Amended Complaint states that each of the claims contained therein is asserted against all Defendants, Plaintiffs have not alleged acts committed by the Non-CBCS Operations Defendants that would *independently* give rise to liability against them. Accordingly, the only remaining question is whether they should remain in the case under a veil piercing theory.

[16] This same principle applies equally to limited liability companies. *See S. Shores Realty Servs. v. Miller*, 251 N.C. App. 571, 584 (2017) ("[O]ur appellate courts have generally upheld the imposition of personal liability upon an individual manager of an LLC under the same circumstances that support piercing the corporate veil.").

form." *Campbell Sales Grp., Inc. v. Niroflex by Jiufeng Furniture, LLC*, 2022 NCBC LEXIS 148, at **45–46 (N.C. Super. Ct. Dec. 5, 2022) (cleaned up).

128. While courts have the ability to "pierce the corporate veil whenever necessary to prevent fraud or to achieve equity[,]" the decision to do so "is a strong step: Like lightning, it is rare and severe." *Id*. at **46 (cleaned up).

129. In analyzing veil piercing claims, North Carolina courts have utilized the "instrumentality test. Under this test, piercing the veil may be appropriate when the entity is the mere instrumentality or alter ego of another entity or individual." *Id*. (cleaned up).

130. To satisfy the "instrumentality test," a plaintiff must prove the following three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id*. at **46–47 (cleaned up).

131. In assessing "whether the first factor of the instrumentality test has been met, our courts have emphasized the relevance of the following factors: (i) inadequate capitalization ('thin incorporation'); (ii) non-compliance with corporate formalities; (iii) complete domination and control of the corporation so that it has no

independent identity; and (iv) excessive fragmentation of a single enterprise into separate corporations." *Id.* at \*\*47 (cleaned up). "These factors are not exclusive, however, and the presence or absence of any particular factor is not dispositive." *Id.* (cleaned up). Moreover, "when a plaintiff seeks to pierce the corporate veil of an LLC, rather than a corporation, these factors may be weighed differently." *Id.* (cleaned up).

132. In support of their veil piercing argument, Plaintiffs essentially argue that all of the entities they have sued are mere alter egos and instrumentalities of each other and of Lindberg.

133. However, while Plaintiffs have alleged elements of commonality regarding the ownership and corporate structure of the various entities, they have not sufficiently pled the elements of the instrumentality test. It is simply unclear from the Amended Complaint which entities are alleged to actually control which other entities and how any such control specifically relates back to CBCS Operations. Indeed, at the 21 May hearing, Plaintiffs' counsel candidly admitted that further discovery is needed to provide clarity on this subject.

134. But in ruling on Defendants' Motion the Court must ultimately evaluate the sufficiency of the veil piercing allegations as they are currently pled. At this time, the Court finds these allegations to be lacking. *See Rockingham Cnty. v. NTE Energy, LLC*, 2024 NCBC LEXIS 55, at \*\*15 (N.C. Super. Ct. Apr. 15, 2024) (finding plaintiff did "not properly allege the elements of veil piercing as that doctrine has been historically recognized by North Carolina courts" where, "rather than specifically stating which corporate forms the Court should disregard, the [plaintiff] instead

ask[ed] the Court to treat each of the Defendant entities 'as one and the same'"); *Blue Ridge Pediatric & Adolescent Med., Inc. v. First Colony Healthcare, LLC*, 2012 NCBC LEXIS 52, at **15–16 (N.C. Super. Ct. Oct. 3, 2012) (dismissing veil piercing claim where plaintiffs failed "to point to specific acts of control or domination" and instead relied on "legal conclusions, unsupported by actual facts"); *W & W Partners, Inc. v. Ferrell Land Co., LLC*, 2018 NCBC LEXIS 52, *25–26 (N.C. Super. Ct. May 22, 2018) (dismissing veil piercing claim where allegations consisted of "rote recitation of the factors enunciated by North Carolina's appellate courts" and did not include specific facts showing domination).

135. Nevertheless, the Court—in its discretion—elects to **DISMISS** Plaintiffs' veil piercing "claim" without prejudice. *See First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) ("The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]").

## CONCLUSION

**THEREFORE**, it is hereby **ORDERED** as follows:

a. The Moving Defendants' Motion to Dismiss is **GRANTED** as to the following claims seeking monetary relief:

    i. Bornstein's claim for breach of the EEA and Consulting Agreement against CBCS Operations. This claim is **DISMISSED with prejudice**.

    ii. Plaintiff CBCS's express claim against CBCS Operations for breach of the EEA by intentional devaluation of its phantom equity interest. This claim is **DISMISSED with prejudice**.

iii. Plaintiffs' claim for breach of fiduciary duty. This claim is **DISMISSED with prejudice**.

iv. Plaintiffs' claim for constructive fraud. This claim is **DISMISSED with prejudice**.

v. Plaintiffs' claim for piercing the corporate veil against the Non-CBCS Operations Defendants. This claim is **DISMISSED without prejudice**.

b. The Moving Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part**, as set forth above, with regard to Plaintiffs' claim for declaratory judgment.

c. To the extent Plaintiffs' requests for an accounting and a constructive trust are pled as *claims*, they are **DISMISSED without prejudice** to Plaintiffs' right to seek them as *remedies* in this action in accordance with applicable law.

d. The Moving Defendants' Motion to Dismiss is **DENIED** in all other respects.

**SO ORDERED**, this the 9th day of July, 2025.[17]

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases

---

[17] For the sake of clarity, the only remaining Defendants in this matter based on the rulings contained in this Opinion are CBCS Operations, Eli Global, and Global Growth. The caption on all future filings in this case should be changed accordingly.